Next case is Childress v. Wilson. And is it Daniel Jones? Yes. Okay. Mr. Jones, when you're ready, would you proceed please? Okay. Please proceed. Thank you, Your Honors. May it please the Court. My name is Daniel Jones, and I represent the plaintiff, Brittany Childress, both individually and as the parent and next friend of her son, Chandler Bjork. Your Honors, there's three real issues, I think, that are before this Court today in this gram shop action. The first one is whether the liquor that was consumed by Jordan Wilson at Highlanders Tavern was a material and substantial factor in causing Jordan Wilson's intoxication. The second is on the issue of complicity. And the issue before the Court is really whether Brittany Childress actively contributed to or procured the inebriation of Jordan Wilson. And finally, in the alternative accounts, whether the cumulative effect of telling the jury it could find for the defendant if Brittany Childress was just a little bit complicit, combined with a jury instruction that did not inform the jury that Highlanders had the burden of proof on the issue of complicity, created an unfair trial which requires a new trial for Brittany Childress. Your Honors, this is a gram shop case. It stems from an automobile accident that happened sometime around, in late on December 15, 2007, or into the early morning hours of December 16, 2007. Following that accident, Jordan Wilson, who was the driver of the motor vehicle, pleaded guilty to a charge of aggravated DUI. It was a Class 4 felony. But the record shows that at 12.16 a.m. on December 16, 2007, Jordan called his father, Lance Wilson, and said, I've been in a motor vehicle accident. Police are called. They show up. They are dispatched. The deputies from Jasper County are showing up after they get dispatched at 1.32 a.m. No one exactly knows when the occurrence took place, although we do have the phone records from December 16. Earlier that evening, December 15, 2007, Brittany Childress and Jordan Wilson had gone out on a date. She showed up at his place of employment around 5 p.m. They then went and drove through a packaged liquor store where Jordan Wilson bought a six-pack of beer. Their intention that night was to go and paint a church and earn some extra money. So between the packaged liquor store and Jordan Wilson's home, they were going to change clothes. Jordan testifies he thinks he had a beer. They then go to the church. It's about another 15-minute drive, and he testifies he had a beer on the way there. They're at the church for a couple hours painting. They go back to Jordan Wilson's house, and he says he may have had one or two of those beers on the way back. They change clothes, and on the way back, Brittany Childress suggests they go to Highbenders, which is a tavern in Jasper County. Jordan agrees to go. Brittany had left her car at his place of employment. She couldn't have driven away if she'd wanted to, but his car at Jordan's house. They talk to Jordan's dad about getting some money to go to Highbenders, and Jordan's dad, rather than taking a check from anybody, gives $20 to Jordan so that they can go to Highbenders. So they go to Highbenders. The testimony is a little varied at that point. There is no doubt that Jordan Wilson was drinking at Highbenders. Unfortunately, Brittany Childress doesn't remember much from this night. But Jordan testified, I had three beers at Highbenders, and he's testified to different things along the way, but his deposition testimony, the one he admitted to at trial, was that he drank three beers at Highbenders. Angel Slane, who's the bartender at Highbenders, testified that Jordan had about two rum and cokes that night. Either way, Jordan admits he was intoxicated when he got to Highbenders, and then he was even more intoxicated when he left Highbenders. Angel Slane testified they left around 1130, which was closing time. Jordan says they were there after closing time. But Jordan says, I didn't have any more beer from the time we left until the time we left to go back to Oblong, Illinois, which is when he crashed, causing the injuries to Brittany Childress, who is a paraplegic, will not be able to work again in her field as a CNA or any other field that requires her to walk. The testimony was clear that she will not be able to walk again except for short distances with assistance and has suffered permanent injuries. Daniel Brown, who's the only toxicologist who offered scientific testimony, went through a process called retrograde extrapolation, whereby he was able to take the blood draws that were done from Jordan Wilson and determine what his blood alcohol content was. His blood alcohol content was drawn twice, once from the police lab and once by the hospital itself, and they, at around 5.05 a.m., which is almost five hours after Jordan called his dad, he's got a blood alcohol content around .0165. And by doing retrograde extrapolation, Dr. Brown told us his BAC was around .216, and that's 1.30. Now, 1.30 again is not the time of the accident. It's the time the deputies got dispatched to the scene. We know the accident is at least an hour before then, more than an hour, because at 12.15, Jordan calls his dad. When presented with these facts, the lower court should have granted a directed verdict for the plaintiff on counts two and three, which were the dram shop actions. Count two is brought for Brittany, for her own injuries. Count three is brought on behalf of Tamara York, Brittany's son. A directed verdict, and I know the court's familiar with the standard, but a directed verdict is properly when the evidence viewed in the light most favorable for the defendant is so overwhelmingly favorable for the plaintiff that no contrary verdict could ever stand for the defendant. And that's the burden here today. And when we look at the jury instructions, Section 150.02, there are five factors that must be proved by the plaintiff. The first one is Jordan Wilson was intoxicated at the time of the incident. The second was that Highbender sold or gave Jordan Wilson alcohol. The third is that the alcohol consumed by Jordan Wilson was a contributing factor to his intoxication. The fourth, that it was his intoxication that was at least one cause of the motor vehicle accident. And five, that Brittany suffered injury. Judge, I think everyone here today, judges, I think everyone will tell you here today that the only real issue in controversy is that third factor, and whether the liquor consumed at Highbender's was a cause of his intoxication. Dr. Brown is going to tell you, or did tell us in trial, that Jordan Wilson really had somewhere between 14 and 14.5 drinks that night. Otherwise his blood alcohol content at 5 a.m., which again is five hours after the accident, would not have been at .165. And so the issue is whether those three drinks that he admitted to taking or the two rum and cokes that Angel Slane admitted to serving him were a material and substantial cause of his intoxication. And that's the standard that's given to us by the Thompson case cited in our brief. It must show that the actions, the dram shop's actions, were a material and substantial factor in causing the intoxication. It's not necessary to prove they were the sole cause, but they must be a material and substantial cause. And so what Dr. Brown does is he goes back and he says blood alcohol content was .216 at 1.30 and if we go back to an hour before that or so, his blood alcohol level an hour earlier was probably around .23. And so Dr. Brown goes through in his testimony, he goes through several different scenarios, and they're all about, okay, how's this one with three beers? How's this one with two rum and cokes? The rec is at .1215 and the rec is at 1.30. Every single scenario he comes back, Dr. Brown tells us that the liquor consumed at Highbenders was a material and substantial cause of Jordan's intoxication. He also tells us that any alcohol contributed or served by Highbenders contributed to Jordan's intoxication and was still in his body at the time of the rec. Now, counsel in their brief has suggested that Jordan's blood alcohol content was at .2 before he walked into Highbenders and it was .216 at the time of the rec, and so there's not that big a difference and it really wasn't a material or substantial cause. And Dr. Brown addressed that. First of all, we all know that .216 is the 1.30 time, and we know that the accident was actually an hour before that, at least, when his blood alcohol level was at .23. Dr. Brown also talked about the ski slope effect of drinking alcohol, and after your blood alcohol content gets to .1, every drink you take magnifies itself almost like a ski slope if you put it on a graph such that your impairment becomes greater and greater, and so his blood alcohol gets to around .23. His impairment comes up, and as Dr. Brown testified, those three beers, those three beers out of 14 that he had at Highbenders, particularly since they're so late in the drinking episode, could be or were a material factor and cause of his intoxication. There's no testimony from the defendant to suggest otherwise. There's no testimony, either scientific or otherwise, to suggest that those three drinks, or two if you call them rum and cokes, were not a material and substantial cause of his intoxication. Now, counsel has suggested in his brief that if you look at Section 3.08 of the Illinois Pattern Jury Instructions, that allows the jury to disregard the scientific testimony here, and that's not what 3.08 does. 3.08 says that the jury is to give an expert witness what weight it thinks the testimony deserves, along with all the other evidence. In this case, there is no other evidence to consider. There was no scientific evidence offered by the defense. There was no other evidence to suggest that that alcohol was not a substantial and material cause of his intoxication. Jury Instruction IPI 1.01 tells us that a verdict cannot be based upon speculation, prejudice, or sympathy, and those words are exactly mirrored in the Stafford case I've cited in our brief. Jury Instructions also tells us about circumstantial evidence in 3.04. And the example that Jury Instructions have now in 3.04 about circumstantial evidence, if a man walks into a room and he's wet and carrying an umbrella, you can't infer, even if you can't see outside, you can infer properly that it has been raining outside. However, there's got to be some sort of evidence for them to make that conclusion. You can't just jump to the conclusion that it's raining. There's got to be a wet person with an umbrella in front of you before you can make that conclusion. And what the defense will tell you is that there were three things that allows them to disregard the scientific testimony of Dr. Brown. First, there was an empty beer box found in the car. Second, there was one unopened can of beer. And third, when Jordan was questioned at the scene and unquestionably intoxicated, he said that Brittany had got her beer from the street master. No one knows what that means or who the street master was or where that comment came from. But from those three things, they want you to assume that the liquor consumed at Heitmender's was not a material and substantial cause of his intoxication. There's no scientific evidence. There's no man who's wet and holding an umbrella to allow them to disregard the scientific evidence presented by Dr. Brown. Therefore, the plaintiff has proved all five elements of her claim. Count one, Jordan was intoxicated. He proved he pleaded guilty to aggravated DUI, Class IV felony. Number two, that Heitmender's solder gave Jordan Wilson liquor. They admitted that both in their answer and through the testimony of Angel Slane. The fourth thing they must prove is that the intoxication was a cause of the reckoning. And I think that's in question. And number five is that Brittany was injured. Unquestionably, she was injured as a result of all of this. The plaintiff was entitled to a directed verdict as to counts two and three of her complaint. And the alternative, they were entitled to a judgment notwithstanding the verdict on these issues. And so under either theory, there should be a reversal as to those issues. The second issue before this Court is the issue of complicity. And on that count, the defendant has the burden of proof. And they have to prove by preponderance the evidence that Brittany Childress actively contributed to or procured the intoxication of Jordan Wilson. The defendant has failed to meet this burden. And they've not proved the key words there, actively contributed to. And what they have tried to do is more than just passive accompaniment through social companionship through drinking with active participation. And the cases are all sort of a mess on these things. There are two Supreme Court cases. One is the Nelson case from 1978. The other one is the Walter case from 1995. Out of those two cases comes law that a plaintiff is only guilty of complicity if the defense can prove by preponderance the evidence that she actively contributed to or procured the intoxication. Now, cases talk about different factors. And in the Walter case, the Supreme Court warned us that you should not place too much emphasis on certain factors, such as who buys rounds of drinks. And there's nothing in this record to support any conclusion that Brittany bought anything for Jordan Wilson. Jordan Wilson testified, I bought the beer at the packaged liquor store on the way. There, I bought all my own drinks at High Bank. My dad gave me the $20, I put it in the bar. That's what I used to drink. Angel Slane, the bartender, says Jordan was the only one that bought him alcohol. Brittany did not encourage him to drink, didn't buy him any drinks, didn't serve him any drinks. The case I think the Court needs to look at that's cited in our brief is the Graham v. United National Investors, which is a Fourth District 2001 case. And in that case, three plaintiffs go on what the Court calls a tour of taverns in Springfield and Jacksonville. And they go to these three different places, and one of them actually gets in a fight and gets arrested, the guy that had been driving. And after that guy gets carted off to jail, the plaintiff realizes he's got the keys to the truck, so they decide they're going to go on home, and they have a wreck on the way home, and the plaintiff is injured. When they brought their Dram Shop action in, the Court focused on the issues surrounding the issue of complicity. What the Graham Court noted is that some courts erroneously talk of things like willing encouragement of the drinking or voluntary participation or bar hopping or purchasing rounds of drinks, and these topics blur the distinction between actively causing another's intoxication and merely providing social companionship or being present. And those are the words the Court uses, blurring that distinction between active participation and passive participation. And I've cited two cases from Minnesota who has a similar Dram Shop law to ours, which talks about blurring that distinction between active and passive participation. I've quoted the Sprague case, who tells us that the fact that a person accompanies someone to a bar is not a bar to their recovery in a Dram Shop action. Active participation includes furnishing drinks, and it must be affirmative participation in procuring the inebriation. Standing alone, passive accompaniment is insufficient to find complicity. And the Sprague case talks about the Hampstead case, which is a Minnesota Supreme Court case from 1969. In that case, two sisters go out drinking, and they drink. And they pay for their own drinks where someone buys them their own drinks. But they are drinking, and they are together all the time. And they have a car wreck on the way somewhere, and one of them passes away. The Court finds there's no complicity. There's nothing to suggest that one sister incurred the other one, that bought drinks for the other one. There's nothing there to suggest that there was complicity in the other's intoxication. They were present with each other all the time and drinking at the same time. The Court told us in Hampstead that as long as the party seeking to recover has not procured or furnished liquor to the inebriate, it's not active participation. There was no evidence that the deceased sister had paid for intoxicating liquor for her other sister or induced her to drink to the point of intoxication. You couldn't blur the lines between active participation and passive participation. Here the defense is trying to do the same thing. It's trying to blur that line between active and passive participation. They claim in their brief four things that show Brittany was actively participating in the drinking procedure. One, Brittany allegedly was the one that wanted to go to Highbender's. Well, that's not active participation. Two, Brittany was in the vehicle with Jordan when he drank on the way to the church and back and was also present at Highbender's and did not stop him or voice a complaint. And that's not active participation. Third, Brittany wrote a check for $20 and left with $5. Again, that's not active participation. There's no evidence that she bought a drink for Jordan. There's no evidence of what she did with that $15. The people that were there, Angel Slane and Jordan Wilson, say she didn't buy any drinks for Jordan. Again, the man with the umbrella who was wet has to be there before you can make a jump using circumstantial evidence to the conclusion that it's raining. People that were there said she didn't buy drinks. The fourth thing they'll claim is that Brittany consumed alcohol. Again, that's not active participation in his intoxication. When you set that line between active and passive participation, there's no evidence that she was drinking. So when you look at all the evidence, there was not, by preponderance, the evidence that Brittany was actively contributing to his intoxication. And we believe that the directive verdict should have been granted there or in the alternative at J&OB. The last thing that we've got, then, judges, in the alternative, if the court finds that the trial court acted properly there, there should have been a new trial because of the closing argument and the jury instruction. In that case, things were compounded. Improper jury instruction was given that did not inform the jury that the defendant had the burden of proof on complicity, and there was also an improper allowing of the defendant to say that Brittany could lose on the issue of complicity if she were just a little bit implicit. Either one of those things would entitle Brittany to a new trial. However, when they're compounded, there's a cumulative effect, and those are the things that deprive her of a fair trial. And I assume my time is almost up. So I will conclude by saying that Brittany should have been awarded a directive verdict on both counts 2 and 3 of her complaint and on the issue of complicity or J&OB. Her damages could be determined by an editor. If not, she's entitled to a new trial because of the jury instruction and the closing argument. Thank you, Your Honor. Thank you. Mr. Karpus. Yes, Your Honor. Thank you. Entities of court and counsel, my name is Mark Karpus, and I had the pleasure at the trial of representing the Gramshop, in this case, Highlanders from St. Marie, Illinois. And working in relatively close to the same border as Mr. Jones did, the trial court here, Judge Schmorm, was proper in letting the issue of liability go to the jury in this case. Plaintiff's own toxicologist, Dr. Brown, testified that the AIP, Mr. Wilson in this case, walked into our grant at or in excess of .20, which was multitudes in excess of the statutory limit for intoxication in the state of Illinois. As such, under the jury instruction which Dan cited, we could not have caused the intoxication of Jordan Wilson. It comes down then to whether there was some material or substantial contribution to it. And the jury certainly could have taken the jury instructions that were read to them in this case and discounted or disregarded Dr. Brown's testimony altogether. And there were a variety of different points on which to do that. The first was that fact that I just mentioned. Dr. Brown testified that Mr. Wilson walked into our bar in excess of .20. Substantial and material contribution to intoxication at that point seems to be closing the barn door after the horse is out. Second is the fact that Dr. Brown could not account for all of the drinks that were allegedly consumed by Mr. Wilson on the evening in question. Mr. Wilson testified to having consumed three drinks in our establishment. Dr. Brown, I believe, actually said that there were in the area of 13 to 16 that were consumed, but he could only account for the six, three that he had consumed from the six-pack that he obtained right after work, the three in our establishment. Next, there was testimony from Dr. Brown that he essentially, he, Dr. Brown, shut the drinking off at or around midnight, but Jordan Wilson himself testified that he was consuming alcohol all the way up to the time of the accident. And this, on the creaky floor there, this is borne out by the fact that there was a box, a Bud Light box found at the scene. It had a beer in it, and Mr. Wilson was talking to the witnesses who arrived at the scene, basically saying, find all the beer. He wasn't doing that to find the empty cans for recycling purposes, I would submit. So Dr. Brown's testimony takes hits in a variety of different areas, and I would suggest to you that the instruction 3.08 that was read to the jury, and I believe that was actually plaintiff's instruction, says that you can, as a jury, discount that testimony altogether of the opinion witness. It does not matter that the opinion witness is a witness who is offering opinions. In fact, the instruction itself said, or says, in part, quote, the fact that people have given an opinion does not mean that you are required to accept it. Give the testimony whatever weight you think it deserves, considering the reasons given for the opinion, the witnesses' qualifications, and all of the other evidence in the case. Well, the plaintiff would suggest that perhaps Dr. Brown is the beginning and end of all of the testimony with regard to what it is the jury should have considered with regard to the issue of liability. We would suggest to you that the trial court was correct in submitting this case to the jury. It was not a slam dunk for the plaintiff, and it's rather ironic that the plaintiff intends that the case was so good for direct verdict in one part of the brief, yet in another part of the brief was talking about how it was such a, quote, close case. So you can't have it both ways. The trial court was correct in letting the case go to the jury on the issue of liability. On the issue of complicity, again, the case is one that was properly submitted to the jury. The Walter case, which is a Supreme Court case, obviously, but it is also one which came through this court as the trial court's decision came out of Eppingham County. And in that particular case, the Supreme Court said, if there are disputed issues of fact with regard to the issue of complicity, and in this case, obviously, we believe that there were, and so did the trial court, that case should go to the jury. Let the trial court back the site. And Judge Schwarm was correct in doing that in this case also. And on that issue, there were a variety of different things that constituted the active participation by Brittney Childress in Jordan Wilson's intoxication. Brittney wanted to be the one that went out for the evening. She had a three-day weekend. Jordan had to work the next day. He didn't want to go out. He only had $20. Brittney was in the vehicle watching Jordan consume alcohol prior to and at the end of the evening at Highlanders, and that's put in the evidence by what the state trooper said about the box of alcohol that was found at the scene. Brittney specifically suggested Highlanders because she thought she could go in there and get served. Jordan could have gone anywhere. He was over 21. Brittney had to go to Highlanders if she intended to be served. So if this was going to be just your standard evening to go out for a soda and a hot dog or something like that, who cares where they would have gone? She directed the evening to Highlanders because that's where she thought she could get served. Jordan testified that at the end of the evening, his $20 was completely exhausted. Trooper Sutton from the Illinois State Police talked about the beer at the scene, the fact that Jordan's BAC was .165. And this is, once again, as Mr. Jones indicated, several hours removed from the time of the accident. Brittney's was .181, once again, several hours removed from the accident. And Dr. Brown testified to the fact that, in his opinion, there was a 13 to 16 drink range over the course of the entire evening that Jordan had consumed, but the accountability for which was only a six-drink evening as far as that evidence that was presented to him was concerned. Brittney, because of what she had gone through, she had no recollection of the evening in question. She did say that she was able to go back, and from her check record, she found a check she wrote to Highlanders for $20. She had $5 at the end of the evening, so 15 of that was gone through the course of the evening. And no evidence of her having spent anything else other than at Highlanders. The thrust of it is this. If Dr. Brown is correct, and there were 13 to 16 drinks, which resulted in Mr. Wilson having a BAC in the area of .16-ish, and if that same number of drinks were consumed by Brittney to get her to a point where she was at .18, Jordan's $20 wasn't going to go very far. It certainly could not have covered what could have been consumed over the evening of approximately three dozen drinks, which means there had to have been, and the jury was certainly free to assume this and conclude this based on the evidence, the fact that Brittney had purchased alcohol for Jordan. There was no other way around it. His money did not go as far as the entire evening's worth of alcohol that was consumed. So there certainly are facts that are in dispute here with regard to the issue, and Judge Schwarm was correct in letting the case go to the jury, and the jury obviously made their findings accordingly. In addition to this, and this certainly is not insignificant, the jury found Brittney 45% comparatively at fault. Now, in the 150 series instructions, when one talks about complicity, there are no percentages similar to what one finds in the comparative fault instructions, the issues in the burden of proof. So the jury could have concluded here that she was 1% complicit, bar her recovery, which obviously is something that either they struck upon or they found against her on the issue of liability or both. The fact is we don't have any sort of supporting evidence that's been proffered to you by the plaintiff who has the burden here of any affidavits from the jurors that this was the mindset that was going on at the time. If you read the record, Judge Schwarm indicates that clearly the jury might be looked to be called upon by the attorneys in the case for questions with regard to the situation, and the fact that there is nothing in the record to suggest that any of those contacts have been made certainly does not bear on us in defending this verdict. So with the disputed evidence in place, the language of the Supreme Court, and this court as far as the Wilson case is, excuse me, I'm sorry, the Walters case is concerned, there clearly was sufficient evidence for this case to survive the record verdict, make it to the jury, and obviously for the jury to find accordingly. Just briefly here in what time is left, as far as the instruction is concerned on complicity, as we argue in our brief, the IPI instruction should have been used and was used. The burden of proof of complicity is expressly set forth in the 150.17, I believe is the number, it specifically states that the DRAM has, must prove the issue of complicity as it's defined in there. The comments that are contained within the confines of the 150.17 specifically indicate that since the Walters case, 150.17 as stated by IPI is the only version of 150.17 that has ever been used in a case of complicity. No such instruction as that which was proffered by the plaintiff and refused by the court has ever made it to a jury's reading and consideration. So obviously we believe the trial court was proper in refusing their instruction and allowing the IPI version of 150.17. As far as the final argument is concerned, it's interesting to note that if one looks at the actual transcript of the final argument, I did make the statements with regard to finding her a little bit complicit, that's plainly apparent. But that was made in the context of comparing the contributory or comparative fall of the plaintiff, which does have assigned to it a percentage. And obviously an impressive one here as far as the plaintiff is concerned versus complicity, which does not have a percentage that one can attach to it. So obviously if the jury finds the plaintiff is 1% complicit, 3% complicit in their minds, they don't assign a percentage. They just find she's been barred from having a recovery, and that was done here. But what's interesting about the outrage over the final argument is the fact that the objection was not made at the time that the final argument or the suspect's statements were made. It was several pages later, and Mr. Tappella, in his objection, he bases it on a trial memorandum or an objection with regard to the issue of complicity that was filed before the final arguments were ever made. And that's clearly apparent through the record. The objections were not made in a fashion which were timely in the sense of contemporaneous with the final argument or that portion of which it was objected to were made, but the objections were made down the road a bit during the course of the factual discussion and not in a fashion that would suggest at the time that the argument was actually made. In our brief, we cite the Myers case, Myers v. Heritage Enterprises, and in fact it may be a case that's in the plaintiff's brief also. But as far as the final argument is concerned, really this about says it all. The Myers case is 351 L.F. 3rd, 241. It's a 4th District, 2004 case. But it states that, quote, whether a party has been denied his right to a fair trial as a result of final argument or improper argument requires a consideration of the entire trial, and the trial court having been in a unique position to make that determination is afforded great discretion. Those are the appellate court's words, great discretion. And we believe that Judge Schwarm made the right decision in overruling the objections of counsel to that portion of the final argument that we're here to talk about today. Unless there are any questions, those are all the arguments that I have. I thank you very much for your time.  Thank you. Rebuttal, please. Thank you, Your Honors. May it please the Court and counsel just briefly on rebuttal. When you consider the issue of complicity, I think you need to consider what counsel said right at the end of his argument on complicity. He said the plaintiff certainly has the burden here. The plaintiff doesn't have the burden here. The issue of complicity is their burden. He can get confused after all the research and all the time they put in before this court, how is a jury supposed to do on three or four days' worth of evidence and a jury instruction? That's an incorrect statement. The defense has the burden on the issue of complicity. And that goes to why the jury instructions are so confusing and why when the jury instruction that was not explanatory of what, who has the burden of proof, is combined with the suggestion that you can be just a little bit complicit. It's confusing to the jury. It does not convey that there was a responsibility by the defense to prove by a preponderance of the evidence that Brittany Childress actively contributed to the inebriation of Jordan Wilson. When it comes to the jury instructions, Supreme Court Rule 239 provides you should use the IPI instruction unless the court determines the instruction does not accurately state the law. And, in fact, a non-IPI jury instruction can be used in conjunction with an IPI instruction when the instructions altogether form a clear and adequate picture of the applicable law and the use of the non-IPI instruction is done in a simple, brief, impartial form and is free from argument. That's what our addition to the pattern jury instruction did. 150.17 does not inform the jury of who's got the burden of proof. We added one sentence in our proposed jury instruction. The defendant has the burden of proof on the issue of complicity. Again, it's confusing. The counsel confused his burden right here in front of you. The proposed jury instruction was simple, brief, impartial, and free from argument. I'd encourage the court to read the Christensen case that's in our brief. That talks about a case in which the defendant was involved in the driver of a car hit a cow that had wandered out into the road. And so it's a case brought pursuant to the Animal Running at Large Act. And the defendant tendered IPI 21.03, which is the burden of proof instruction, and the plaintiff suggested that something more needed to be given because the defendant had raised affirmative defenses, just like the case here, and there needed to be further investigation about who had the burden of proof on those affirmative defenses. And in that case, the court agreed, and it was this court back in 1997 that agreed, that when, and this was an animal running at large case, it was not a dram shop case, but when the IPI does not give a full and complete instruction to the jury about the burden of proof on an affirmative defense, you can supplement and you should supplement, and that's what we learned from the Christensen case. In this case, when the jury instruction, which was confusing to the jury, was also given and allowed to stand with the suggestion that if she was just a little bit complicit, the jury could not be helped but be confused as to who had the burden of proof on complicity. As far as the issue of complicity, there's no proof that there was active participation on behalf of Brittany Childress. There's a beer box in Jordan's car. No one knows how long it was there. No one knows what it was from, but it was there. That's not active participation by Brittany. Neither is not telling him not to drink in the car. That's not active participation in drinking herself. It's not active participation. There's no evidence of complicity in this case on behalf of Brittany. Thank you, Your Honor, for your time. Thank you. Thanks to both of you for your arguments and briefs, and we'll take the matter under advisement. Thank you.